**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-24-14

| | |
|---|---|
| **WILLIAM EDWARD CROWLEY, JR.,** | : |
| Plaintiff, | : |
| - against - | : |
| **CAROLYN W. COLVIN,**<br>**Acting Commissioner of Social Security,** | : |
| Defendant. | : |

**REPORT AND
RECOMMENDATION**

**13 Civ. 1723 (AJN) (RLE)**

**TO THE HONORABLE ALISON J. NATHAN, U.S.D.J.:**

## I. INTRODUCTION

Plaintiff William Edward Crowley, Jr. ("Crowley") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g) and/or U.S.C. § 1383(c)(3), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for social security disability benefits. Crowley asks the Court to modify the decision of the Commissioner and grant him disability benefits, retroactive to the date of the initial disability, or in the alternative, to remand the case for reconsideration of the evidence. Crowley argues that the decision of the Administrative Law Judge (the "ALJ") was erroneous and not supported by substantial evidence. Crowley raises three issues: (1) the ALJ failed to properly evaluate the medical evidence; (2) the ALJ's vocational analysis was flawed; and (3) the ALJ failed to properly evaluate Crowley's credibility. On July 15, 2013, the Commissioner moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to affirm the Commissioner's decision and dismiss the Complaint. (Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem.")) On August 14, 2013, Crowley

cross-moved for a judgment on the pleadings in opposition to the Commissioner's motion, asking the Court to modify the decision of the Commissioner, or to remand the case for reconsideration of the evidence. (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings and in Opp'n to Def.'s Mot. on the Pleadings ("Pl. Mem.")) On August 29, 2013, the Commissioner submitted a memorandum in opposition to Crowley's cross-motion. (Mem. in Opp'n to Pl.'s Cross-Mot. for J. on the Pleadings and in Further Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Opp'n.")) For the reasons that follow, I recommend that the Commissioner's motion be **GRANTED,** and that the case be **DISMISSED**.

## II. BACKGROUND

### A. Procedural History

Crowley applied for disability benefits on October 27, 2011. (Tr. of Admin. Proceedings ("Tr.") at 114-16.) He claimed a disability onset date of June 1, 2010. (*Id.* at 63.) The application was denied on January 5, 2012, *(id.* at 68-73) and on January 17, Crowley requested a hearing before an ALJ. (*Id.* at 78.) Crowley appeared before ALJ Mark Hecht on July 24, 2012, represented by counsel. (*Id.* at 38-65.) The ALJ issued a decision on August 8, finding that Crowley was not disabled under the Act and was not entitled to social security disability benefits. (*Id.* at 23-34.) Crowley requested review by the Appeals Council on September 20. (*Id.* at 21-22.) On January 14, 2013, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Crowley's request for review. (Tr. at 1-3.) Crowley filed this action on March 14, 2013.

2

**B. The ALJ Hearing**

**1. Crowley's Testimony at the Hearing**

Crowley was born October 14, 1967. (*Id.* at 41.) He completed high school and one year of college. (*Id.* at 42.) From 1989 until 2003, he worked as a broker's assistant on the floor of the New York Stock Exchange. (*Id.* at 43.) From 2003 until he was discharged in 2006, Crowley worked as a customer service representative for Bear Sterns. (*Id.* at 43-45.) Crowley testified that he had moved into the customer service position because he wanted a change in function, but he suspected his supervisors transferred him because he was "having a lateness problem and some anxiety problems." (*Id.* at 44-45.) Crowley believed his "anxiety and panic attack problems" led to his discharge in 2006 because he had been criticized by supervisors and told he might be discharged if he did not change his work habits. (Tr. at 45.)

In the late 1990s, panic attacks and anxiety began to impact Crowley's ability to function, but he could not recall a catalyst for his anxiety. (Tr. at 49.) He did not experience headaches, but did experience vertigo, dizziness, and "complete disorientation" during panic attacks. (*Id.* at 50.) He saw doctors at St. Vincent's Medical Center and New York University Medical Center, and spoke to his primary physician, Dr. Glen E. Marin, D.O., who suggested Crowley have a magnetic resonance imaging ("MRI") scan done of his brain. (*Id.* at 49-50.) A full physical did not reveal any cause for his vertigo and dizziness, and the MRI did not show any problems. (*Id.* at 50.)

Crowley began to see a psychiatrist, Dr. Jeffrey C. Benezra, M.D., following his first panic attack. (Tr. at 51-52.) He took a leave of absence from his job for "some months" because of his anxiety. (*Id.* at 51.) Dr. Benezra prescribed anxiety medication which enabled Crowley to

return to work, and Crowley saw Dr. Benezra for psychotherapy two days per week for several years, beginning in the late 1990s, and then later switched to one day per week. (*Id*. at 51-52.)

From the late 1990s until 2006, Dr. Benezra continued to use the same combination of psychotherapy and medication to treat Crowley's anxiety. (Tr. at 53.) In 2003, Crowley took another leave of absence for "a month or so," during which time he continued his treatment with Dr. Benezra until he was able to return to work. (*Id*.) During the hearing, Crowley first stated that his anxiety "stayed the same" after he was laid off in 2006, but then said that it was "a little better" because he had more time to rest and relax after an anxiety attack. (*Id*. at 54.)

Crowley stated that he has anxiety attacks at least three times per week. (Tr. at 54-55.) Some circumstances trigger the attacks, but "generally they can come in any situation." (*Id*. at 55.) The attacks do not occur at any particular time of day, and they last approximately six hours. (*Id*. at 55-56.) Crowley avoids flying and crowds because he believes such situations may trigger attacks. (*Id*. at 62.) He does not have difficulty taking public transportation. (*Id*.) He takes anxiety medication daily as a preventative measure, and takes more if he feels the symptoms of an attack surface. (*Id*. at 56.) When Crowley experiences an attack he is unable to continue with his daily activities. (Tr. at 57.)

Crowley lives alone, and is able to do his own shopping, cooking, cleaning, and laundry. (Tr. at 57.) He sometimes experiences difficulty concentrating, but "for the most part" can read books and magazines, and can watch television. (*Id*. at 58.) He goes for one-mile walks "a couple [of] times a week." (*Id*.) Crowley socializes with family and friends once per month and has no difficulty getting along with people. (*Id*. at 58-59.)

Crowley asserted that he does not feel that he can return to his previous work, either in customer service or as a broker's assistant, because of his anxiety. (Tr. at 59.) He also does not

4

believe he would be able to perform a simple office job such as taking inventory or working as a receptionist. (*Id.* at 60.)

Crowley also testified that he has asthma, and that while it has interfered with his work, it does not prevent him from working. (Tr. at 47.) The ALJ noted that Crowley should not work in dusty atmospheres or high temperatures because of his asthma. (*Id.* at 60.)

### 2. Medical Evidence

#### a. Jeffrey C. Benezra, M.D.

Crowley was first treated by Dr. Jeffrey C. Benezra, M.D., a psychiatrist, in 1998 and, at the time of the hearing, continued to see Dr. Benezra weekly for psychotherapy. (Tr. 51-52, 204, 370.) On December 8, 2011, Dr. Benezra completed a psychiatric evaluation of Crowley, in which he noted Crowley's "long history of panic disorder," and stated that, when Crowley was employed, his anxiety caused him to miss work for extended periods of time. (*Id.* at 204-10.) Dr. Benezra indicated that he believed Crowley's condition would continue indefinitely, rendering him unable to work. (*Id.* at 205-06.)

Dr. Benezra indicated that Crowley was not suicidal, was capable of handling his finances, and had no limitations with understanding, memory, social interaction, or responding appropriately to changes in the work setting. (Tr. at 206-07.) Crowley's attitude, appearance, behavior, speech, thought, and perception were all "good," and his sensory and intellectual functions "intact." (*Id.* at 209.) Dr. Benezra noted that Crowley's anxiety attacks limited his ability to concentrate and to follow schedules and routines without supervision. (*Id.* at 207.) He found Crowley's mood and affect "appropriate," and his insight and judgment "fair." (*Id.* at

5

209.) Dr. Benezra diagnosed Crowley with panic disorder and depression, and rated Crowley's

global assessment of functioning ("GAF") at 50.[1]  (*Id.* at 208.)

On January 17, 2012, Dr. Benezra wrote a letter on Crowley's behalf, stating that

Crowley had suffered from panic disorder and depressive disorder since September 2006, that he

was taking medication and receiving therapy for his conditions, and that the conditions made

Crowley unable to work.  (Tr. 368.)  On April 2, 2012, Dr. Benezra wrote another letter

indicating that Crowley's condition caused him to have "severe panic attacks" which interfered

with his ability to function in society and in a work setting.  (*Id.* at 380.)  Dr. Benezra stated that

he did not anticipate that Crowley would "be able to work in the foreseeable future."  (*Id.*)

On April 2, 2012, Dr. Benezra completed a psychiatric and psychological impairment

questionnaire about Crowley.  (*Id.* at 370.)  He again diagnosed Crowley with panic disorder

and depression, and gave him a GAF score of 50, noting that Crowley's prognosis was "poor."

(*Id.*)  Dr. Benezra indicated Crowley suffered from sleep disturbance, mood disturbance,

emotional lability,[2] feelings of guilt and worthlessness, difficulty thinking and concentrating,

social withdrawal, decreased energy, general anxiety, and daily panic attacks.  (*Id.* at 371-72.)

Dr. Benezra indicated that Crowley experienced no limitation in his understanding and memory

functions, or in his ability to carry out simple or detailed instructions.  (*Id.* at 373.)  He noted that

Crowley experienced "moderate" limitations on his ability to perform activities within a

schedule, to maintain a work routine without supervision, to work with others without being

distracted, to make simple work related decisions, to interact appropriately with the general

---

[1] A score of 50 indicates a patient who exhibits "suicidal ideation, severe obsessional rituals" or serious impairments in social, occupational, or school functioning.  American Psychiatric Association (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., Text Revision). Washington, DC: Author.

[2] "A condition of excessive emotional reactions and frequent mood changes."  Mosby's Medical Dictionary, 8th edition, 2009. *Available at* http://medical-dictionary.thefreedictionary.com/emotional+lability

public, to request assistance, to respond to criticism, to get along with co-workers, to maintain socially appropriate behavior, to be aware of normal hazards and take appropriate precautions. (*Id.* at 373-74, 376.) Dr. Benezra noted that Crowley experienced "marked" limitations in his ability to maintain concentration for an extended period, to complete a normal workweek without interruptions from psychologically based symptoms, to respond appropriately to changes in the work setting, to travel to unfamiliar places or use public transportation, and to set realistic goals. (*Id.*) Dr. Benezra noted that Crowley had not worked in several years, and that he expected Crowley's symptoms to persist for at least twelve months. (*Id.* at 375-76.) He also noted that Crowley did not have a low IQ or reduced intellectual functioning, and that Crowley would be able to handle social security benefits in his own best interest. (*Id.* at 375, 377.)

Dr. Benezra provided progress notes from sessions with Crowley that took place between August 1, 2011, and July 2, 2012, but the notes are illegible. (Tr. 510-15.)

### b. Glen E. Marin, D.O.

Physicians at Patients First Family Medical Care, North Shore-Long Island Jewish Medical Center ("North Shore-LIJ"), including Crowley's primary physician Dr. Glen E. Marin, examined Crowley on several occasions between March 9, 2007, and December 27, 2011. (Tr. 244-367, 381-508.) Dr. Marin's records provide a general overview of Crowley's physical health during these years. (*Id.*) On November 21, 2008, Crowley was found to have allergies to dust and to oak trees. (*Id.* at 343, 484.) From November 19, 2009, to June 3, 2010, Crowley was treated for various skin maladies, including: basal cell carcinoma, granulation of tissue, junctional melanocytic nevus and dysplastic nevus[3], a follicular cyst, and scarring. (*Id.* at 280-

---

[3] A nevus is any congenital lesion of the skin, such as a birthmark or mole. A nevus that is junctional is one that appears at the place where two types of tissue come together. Melanocytic refers to an excess of melanin, which produces a dark coloration. Dysplastic refers to any abnormality of development, such as in size or shape. *See* Dorland's Medical Dictionary at 517, 872, 1004, 1135 (28th ed. 1994).

467.) Crowley's glucose levels and LDL cholesterol levels were consistently higher than average. (*Id.* at 246-503.)

### c. Haruyo Fujiwaki, Ph.D.

Dr. Fujiwaki, a consulting psychologist at Industrial Medicine Associates, P.C., in Manhattan, examined Crowley on December 15, 2011. (Tr. at 211-14.) In this examination, Crowley stated that he was having difficulty falling asleep at night and getting up in the morning, that he was experiencing depressive symptoms such as fatigue and social withdrawal, and that he felt particularly depressed in the mornings. (*Id.* at 211.) Crowley also reported that he was experiencing daily panic attacks, with symptoms such as "dizziness, paranoia, a sense of confusion, and a sense of being boxed in." (*Id.*) Crowley stated that he was able to dress, bathe, and groom himself, do household chores, manage his finances, take public transportation, socialize with friends, and that his family relationships were good. (*Id.* at 213.) He stated that he spends his time reading, watching television, and listening to the radio, he likes to go for walks, and he sometimes goes to the movies. (*Id.*)

Dr. Fujiwaki observed that Crowley was "cooperative" and that his social skills and overall presentation were "adequate." (Tr. at 212.) Crowley was adequately groomed, and his gait, posture, and motor behavior were normal. (*Id.*) His speech and language skills were adequate, and his thought processes were coherent. (*Id.*) Dr. Fujiwaki noted that Crowley's intellectual functioning was average. (*Id.* at 213.) Crowley was able to process information, do simple calculations, follow simple directions and instructions, learn new tasks, and perform both simple and complex tasks independently. (*Id.*) Dr. Fujiwaki recommended that Crowley continue with his current psychological and psychiatric treatment, noting that he would be able

8

to maintain a regular work schedule "with some difficulty due to anxiety," and that Crowley

could relate to others and deal with stress "to a certain extent." (*Id.*)

### d. Rahel Eyassu, M.D.

Dr. Eyassu, a consulting physician of internal medicine at Industrial Medicine Associates,

P.C., in Manhattan, examined Crowley on December 15, 2011. (Tr. 215-18.) Dr. Eyassu

observed Crowley's general appearance, gait, and stance to be normal and with no acute distress,

noting Crowley required no assistance to change clothes or move about. (*Id.* at 216.) Dr. Eyassu

noted evidence of psoriasis on Crowley's skin. (*Id.*) A neurological exam showed Crowley's

DTRs[4] to be normal. (*Id.*) Crowley reported that he lived alone, and had no trouble caring for

himself or his household. (*Id.*)

Dr. Eyassu took note of Crowley's medical history, with a focus on his asthma and

psoriasis. (Tr. at 215.) He also noted that Crowley had a history of anxiety and depression. (*Id.*

at 215.) Dr. Eyassu diagnosed Crowley with mild and intermittent asthma, psoriasis, anxiety,

and depression, with a stable prognosis. (Tr. at 217.) He recommended that Crowley avoid dust,

fumes, and other respiratory irritants, but found that he was otherwise unrestricted in physical

activities including sitting, standing, walking, reaching up, pulling, pushing, bending, turning,

twisting and handling. (*Id.*)

### e. State Agency Medical Expert Dr. Kamin

Dr. Kamin, a state agency medical consultant, compiled a Mental Residual Functional

Capacity ("RFC") Assessment of Crowley on January 4, 2012. (Tr. 219-22, 229-42.) Dr. Kamin

found Crowley had a "moderate" limitation on his ability to: understand, remember, and carry

---

[4] "Deep tendon reflexes" ("DTRs") are muscle contractions that are elicited by tapping a patient's muscle tendon (such as below the knee cap). The muscle of a patient with normal DTRs will have a "brisk response." *See* H. Kenneth Walker, W. Dallas Hall, & J. Willis Hurst, *Deep Tendon Reflexes*, CLINICAL METHODS: THE HISTORY, PHYSICAL, AND LABORATORY EXAMINATIONS, at Chapter 72 (3rd ed. 1990), *available at*: http://www.ncbi.nlm.nih.gov/books/NBK396.

out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal workday or week without interruption from psychologically based symptoms; respond appropriately to criticism; get along with co-workers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting. (*Id.* at 219-20.) Crowley had no significant limitations with regard to any of the other activities listed on the form, including the ability to: remember locations and procedures; understand, remember, and carry out short and simple instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work with others without being distracted by them; make simple work related decisions; interact appropriately with the public; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; set realistic goals and make plans independently of others. (*Id.*)

Dr. Kamin found that Crowley exhibited the symptoms of affective disorder and anxiety disorder, but that his symptoms did not fit the specific descriptions listed on the psychiatric review technique checklist ("PRTC").[5] (Tr. at 229, 232, 234.) In assessing the degree to which Crowley's symptoms limited his ability to function, Dr. Kamin found that Crowley had a "moderate" limitation in his ability to maintain concentration, persistence, or pace (*id.* at 239), and a "mild" limitation in his ability to perform the activities of daily living and maintain social functioning. (*Id.*)

Dr. Kamin found that the medical evidence available for review did not support the degree to which Crowley claimed to be disabled by his anxiety disorder. (Tr. at 221.) Dr.

---

[5] The PRTC is the standard document used by the Social Security Administration to evaluate mental health disorders.

Kamin reviewed the medical records provided by Dr. Marin (*id.* at 244-367, 381-508), Dr. Eyassu (*id.* at 215-18), Dr. Fujiwaki (*id.* at 211-14), and Dr. Benezra (*id.* at 204-10). These records indicated Crowley had anxiety disorder and experienced panic attacks, but showed that Crowley was able to function normally and to care for himself and his household without assistance. (*Id.* at 222.) Dr. Kamin reviewed Dr. Benezra's claim that Crowley could not work because of anxiety, and found no support in the medical evidence provided by Dr. Benezra or any other source. (*Id.* at 222.) Dr. Benezra's evaluation was inconsistent because he first noted Crowley was able to function normally, but then concluded that Crowley was disabled and unable to work. (*Id.* at 204-10, 221.) This discrepancy led Dr. Kamin to conclude that Crowley was only "partially credible" in his claims. (*Id.* at 221.) Dr. Kamin noted that Crowley possessed the "capacity for concentration, persistence and pace required in the work setting," and thus proposed that Crowley's application for disability benefits be denied. (*Id.* at 221.)

### 3. The ALJ's Findings

On August 8, 2012, ALJ Mark Hecht ("Hecht") issued his decision that Crowley was not disabled within the meaning of §§ 216(i) and 223(d) of the Social Security Act (Tr. 26-34), and had not been disabled since October 27, 2011, the date his application was filed. (*Id.* at 34.) Hecht found that Crowley suffered from severe impairments, anxiety disorder and depression, but Crowley's impairments did not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). (*Id.* at 28-29.) Additionally, Hecht found that, although Crowley's impairments prevented him from performing his past relevant work (*id.* at 33), Crowley maintained the RFC to perform work that involves simple and repetitive tasks, such as routine office work. (*Id.* at 30.) Hecht, therefore, denied Crowley's claim. (*Id.* at 34.)

11

Hecht explained that in order to satisfy the criteria listings, Crowley's anxiety and depression would need to cause him "marked" restriction in at least two of the following: (1) daily living activities; (2) social functioning; (3) ability to maintain concentration, persistence or pace; (4) restrictions caused by repeated episodes of decompensation, each of extended duration. (Tr. at 29.) Hecht found Crowley had no restriction in his daily living activities, as Crowley lived by himself, and was able to take care of his personal, household, and financial needs without assistance. (*Id.*) Hecht found Crowley had only "mild" difficulty with social functioning, noting his ability to socialize and interact appropriately with others. (*Id.*) Hecht found Crowley to have "moderate" difficulty with concentration, persistence, or pace, and noted Crowley's ability to maintain concentration, adhere to a schedule, and complete basic tasks despite his anxiety disorder. (*Id.*) Based on these findings, Hecht concluded that Crowley's impairments did not satisfy the "paragraph B" or "paragraph C" criteria of the listings. (*Id.* at 29, 239-40.)

Hecht found that Crowley had a RFC to perform "a full range of work at all exertional levels," limited to work that does not involve exposure to dust, fumes or other respiratory irritants. (Tr. at 30, 33.) Hecht noted that clinical records established that Crowley suffered from depression and anxiety disorder, but found that these impairments were not as disabling as Crowley claimed. (*Id.* at 32.) He wrote: "the mental status examinations in the record document essentially normal findings." (*Id.* at 30-31.)

Hecht found that examinations of Crowley conducted by Dr. Benezra and Dr. Fujiwaki showed Crowley's functioning to be "essentially normal." (Tr. at 31.) Hecht gave the most weight to Dr. Benezra's April 2012 report, which indicated that Crowley's limitations were "not to an extent that would preclude him from working," a finding that Hecht believed was supported

by other documents in the record and by Crowley's self-reported ability to live alone. (*Id.*)

Hecht gave "little weight" to Dr. Benezra's opinions that Crowley has "marked" limitation in

adaptation skills, and "moderate" limitation in social interaction skills, because just four months

earlier, in Dr. Benezra's December 8, 2011 examination, Dr. Benezra gave a "strikingly different

assessment," saying Crowley had no limitation at all in these skills. (*Id.*)  Hecht found Dr.

Benezra's repeated statements that Crowley is disabled and unable to work conclusory, and

noted that Dr. Benezra did not provide specific evidence on which he based his assertions. (*Id.*)

For example, Dr. Benezra rated Crowley's GAF score at 50 in December 2011, but provided no

findings in support of this assessment, and in the same document reported Crowley had a normal

mood, affect, attitude, thought process, and orientation. (*Id.*)

Hecht gave "significant" weight to Dr. Fujiwaki's report because it was consistent with

Crowley's treatment history, other evidence in the record, Crowley's self-reported ability to live

alone and to care for himself, and because the report was detailed and specific as to Dr.

Fujiwaki's findings. (Tr. at 32.)  Hecht gave "substantial" weight to the opinion of Dr. Kamin

because it was based on a survey of the medical evidence in the record and because of Dr.

Kamin's familiarity with the requirements of the disability benefits program. (*Id.*)

Hecht found that the record supported Crowley's claim that he has anxiety disorder and

depression, but did not support his assertion that his symptoms were as disabling as he alleged.

(Tr. at 32.)  Hecht found the record showed a "routine, conservative, and stable course of

treatment," with no evidence of periods of decompensation, hospitalization, or emergency room

visits. (*Id.*)  Mental status examinations indicated Crowley's ability to function normally. (*Id.*)

Crowley self-reported that his panic attacks began in 1998 but that he worked until 2006, and

that the frequency and severity of the attacks stayed the same after he was laid off in 2006. (*Id.*)

Hecht found no indication that Crowley's symptoms or condition worsened to the degree that would restrict Crowley's ability to work, including after the alleged onset date in 2010. (*Id.* at 33.)

Hecht found that Crowley's daily activities, including cooking, cleaning, doing laundry, shopping, and paying bills, demonstrated that Crowley's functioning was not as limited as he alleged. (Tr. at 32.) Hecht found that Crowley was "able to function independently, engage in daily activities, maintain social relationships, and maintain the attention and concentration necessary to perform simple and repetitive tasks, despite the allegations." (*Id.*)

Hecht found that Crowley was not fit to perform past relevant work. (Tr. at 33.) Using the Medical-Vocational Rules[6] as a framework, he determined that Crowley was not able to perform the tasks required of him as a customer service representative, and was limited to work that involves the completion of simple tasks. (*Id.*) Hecht considered Crowley's age, education, and communication skills, as well as his RFC, to determine that Crowley was able to meet the exertional and mental demands of unskilled work in an environment free of dust, fumes, or other respiratory irritants. (*Id.* at 33, 34.)

## C. Appeals Council Review

On September 20, 2012, Crowley requested that ALJ Hecht's decision be reviewed by the Appeals Council. (Tr. at 21-22) He submitted additional evidence from the period of September to October 2012, including a psychological evaluation of him by Dr. Sherman on September 15, 2012, and a letter of psychological evaluation from Dr. Benezra, written on October 22, 2012. (*Id.* at 194-98, 521-38.) The Appeals Council denied Crowley's request for

---

[6] The Medical-Vocational Rules provide a guide to determine whether there are jobs in the economy for which an individual is fit, based on the individual's age, education, work experience, and RFC. (Tr. at 33.)

review on January 14, 2013, making the decision of the ALJ the Commissioner's final decision. (*Id*. 1-3.)

### 1. Additional Evidence Submitted to the Appeals Council

Dr. Ronald A. Sherman, Ph.D., a psychologist, examined Crowley on September 15, 2012. (Tr. 522-24.) He noted that Crowley exhibited signs that he was "depressed, anxious, panic stricken, and fearful with shame and guilt, feelings of worthlessness and paranoia, fragile self-esteem, poor frustration tolerance, social withdrawal/isolation with intrusive recollection of traumatic events." (*Id*. at 523.) Dr. Sherman observed that Crowley's concentration and attention to detail were "poor," Crowley had "poor" short and long term memory, and his insight and judgment were "fair." (*Id*.) Dr. Sherman noted that Crowley was afraid of heights. (*Id*. at 522.)

Dr. Sherman diagnosed Crowley with anxiety disorder, panic disorder without agoraphobia, major depressive disorder, and post traumatic stress disorder. (Tr. at 523.) He noted that Crowley had suffered from basal cell carcinoma, asthma, psoriasis, and occupational and economic problems. (*Id*. at 523.) Dr. Sherman concluded that Crowley was "disabled emotionally and unable to function in any job in any capacity." (*Id*. at 524.)

On October 22, 2012, Dr. Benezra wrote a letter describing a treatment session with Crowley in which Crowley reported daily panic attacks and depression. (Tr. 537.) He noted that Crowley's symptoms had caused him to be "out on disability" for several months while he was employed, that his condition had not improved since 2006, and that Crowley was unable to "perform any kind of competitive work on a sustained basis." (*Id*. at 537-38.) Dr. Benezra confirmed the details of the narrative report he submitted to the court on January 17, 2012, and

15

the psychiatric/psychological impairment questionnaire he prepared on April 2, 2012, and stated that the assessments made in the questionnaire remained valid to date. (*Id.*)

## III. DISCUSSION

### A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); accord *Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); accord *Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); accord *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). See, e.g., *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In

16

such a case, the court may remand the matter to the Commissioner under sentence four of 42

U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair

record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008)

(citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the

court must "conduct a plenary review of the administrative record to determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's

decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).

The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.

NLRB*, 305 U.S. 197, 229 (1938)); accord *Brault*, 683 F.3d at 447-48. The substantial evidence

standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a

reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting

*Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on

consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C.

§§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the

evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's

decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d

1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of

medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v.

Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence

17

of a person's alleged disability. See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d

Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008)

(overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002

WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409

(reconsideration of improperly excluded evidence typically requires remand). Eschewing rote

analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any

determination . . . with sufficient specificity to enable the reviewing court to decide whether the

determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250,

269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

When "new and material evidence" is submitted, the Appeals Council may consider the

additional evidence "only where it relates to the period on or before the date of the administrative

law judge hearing decision." 20 C.F.R. § 404.970(b). "New evidence" refers to "any evidence

that has not been considered previously during the administrative process." *Shrack v. Astrue*,

608 F. Supp. 2d 297, 302 (D. Conn. 2009).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is

entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as

an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at

§§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A

claimant's impairments must be "of such severity that he is not only unable to do his previous

18

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the

national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

### 2. The Treating Physician Rule

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, *Burgess*, 537 F.3d at 139, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician.

Second, the ALJ must give advance notice to a pro se claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the pro se claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, No. 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

Third, the ALJ must explicitly consider various "factors" to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and

extent of the treatment relationship; (2) the evidence in support of the treating physician's

opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the

treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that

support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c)(3-6).

Fourth, the ALJ is required to explain the weight ultimately given to the opinion of a

treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our

notice of determination or decision for the weight we give your treating source's opinion.").

Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician

is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Halloran*, 362

F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physician's opinion and we will continue remanding

when we encounter opinions from ALJs that do not comprehensively set forth reasons for the

weight assigned to a treating physician's opinion.").  Reasons that are conclusory fail the "good

reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012)

(finding reversible error where an ALJ failed to explain his determination not to credit the

treating physician's opinion).  The ALJ is not permitted to arbitrarily substitute his own

judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

### 3. The ALJ Properly Reviewed and Considered the Evidence, and Applied the Correct Legal Principles.

#### a. The ALJ Properly Applied the Five-Step Sequential Analysis.

The first task of the Court is to determine whether the Commissioner applied the correct

legal principles in determining Crowley's eligibility for disability benefits. *Rosa*, 168 F.3d at 77.

The Court finds that he did.  (Tr. at 26-34.)  To reach his conclusion, the ALJ conducted the tests

required to satisfy the criteria of the listings.  Under the first step of the evaluation, the ALJ

found that Crowley had not engaged in substantial gainful activity since June 1, 2010, the alleged

onset date. (Tr. at 28.) Next, the ALJ found that Crowley had two "severe" impairments,

anxiety disorder and depression, and two "non-severe" impairments, asthma and obesity. (*Id.*)

He found that Crowley's anxiety and depression caused "more than minimal functional

limitations" to Crowley's ability to work, and met the *de minimis* threshold of severity to satisfy

20 C.F.R. § 404.1520(c). (*Id.*) At the third step of the evaluation, the ALJ found that, although

Crowley's anxiety and depression were severe impairments, they did not meet or medically equal

the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr.

at 29.) The ALJ found that Crowley's impairments did not satisfy the "paragraph B" criteria[7]

because Crowley experienced no restriction to his daily activities, only "mild" difficulties

socializing, only "moderate" difficulties with regard to concentration, persistence, or pace, and

because Crowley had not alleged, nor does the record include any evidence of, episodes of

decompensation. (*Id.*) The ALJ noted that "the evidence fails to establish the presence of the

"paragraph C" criteria."[8] (*Id.*)

Before considering step four of the evaluation, the ALJ determined Crowley's RFC, by

considering the medical evidence of Crowley's severe and "non-severe" impairments, as well as

Crowley's age, education level, and past work experience. (Tr. at 30.) The ALJ used a two-step

analysis to determine Crowley's RFC. (*Id.*) First, the ALJ determined whether there was an

underlying medically determinable physical or mental impairment that could be shown by

---

[7] "Paragraph B" of the listings provides a framework in which to assess the degree of functional limitation experienced as a result of the claimant's disorders. Categories include 1) restrictions of activities of daily living, 2) difficulties in maintaining social functioning, 3) difficulties in maintaining concentration, persistence, or pace, and 4) repeated episodes of deterioration, each of extended duration. (Tr. at 239-40.)

[8] "Paragraph C" of the listings is applied in instances when the criteria of "Paragraph B" are not satisfied, and for a claimant suffering from anxiety disorder, where the claimant experiences a complete inability to function, and for a claimant suffering from affective disorder, where the claimant either experiences severe episodes of decompensation or is unable to live outside of a highly supportive environment. (Tr. at 239-40.)

medically acceptable clinical and laboratory diagnostic techniques, and that could reasonably be expected to produce Crowley's symptoms. (*Id.*) Second, the ALJ evaluated the intensity, persistence, and limiting effects of Crowley's symptoms to determine the extent to which they limited Crowley's functioning. (*Id.*) For this evaluation, where evidence was provided in the form of statements and opinions, the ALJ evaluated the credibility of such statements based on consideration of the entire case record. (*Id.*)

The ALJ found that Crowley had "the residual functional capacity to perform a full range of work at all exertional levels," and that Crowley was capable of performing "unskilled work involving simple repetitive tasks," so long as the work was done in an environment free of respiratory irritants. (Tr. at 30.) He reviewed clinical records and opinion evidence provided by Dr. Benezra, Dr. Fujiwaki, and Dr. Kamin, as well as Crowley's own statements, and found that Crowley suffered from depression and anxiety, which are both medically determinable impairments that could reasonably be expected to produce Crowley's symptoms. (*Id.* at 30-33.) He found, however, that the limiting effect of the symptoms alleged by Crowley was not supported by the evidence. (*Id.* at 32.) For example, Crowley testified that he had experienced anxiety attacks occurring approximately three times per week beginning in 1998, and that he continued to work until 2006, after which time the severity and frequency of the attacks remained the same, and in some respects, got "a little better." (*Id.* at 32-33, 54.) Crowley alleges a 2010 onset date for his disability, but there is no indication in the record that his symptoms worsened at that time. (*Id.* at 33.) There was also no record of increased or changed treatment with Crowley's treating psychiatrist at that time. (*Id.*) In addition, Crowley reports that he is not limited in his ability to care for himself or his household. (Tr. at 32.)

At the fourth step, the ALJ determined that Crowley could not perform any past work because his past work as a customer service representative requires a mental capacity that exceeds Crowley's RFC. (Tr. at 33.) *See* Dictionary of Occupational Titles ("DOT") 205.362-026.

At the fifth step of the evaluation, the ALJ found that Crowley was not disabled. (Tr. at 33-34.) The ALJ considered Crowley's age, education, work experience, and RFC, and applied Medical-Vocational Rule 204, to determine Crowley's ability to adjust to other unskilled work which existed in significant numbers in the national economy. (*Id.*) *See* C.F.R. Part 404, Subpart P, Appendix 2, Table 2; *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986) (vocational expert testimony not required unless occupational base of jobs significantly reduced by nonexertional limitations). The ALJ found Crowley was able to meet the exertional demands of unskilled work, and that his mental impairments did not limit this occupational base. (*Id.* at 34.)

### b. Substantial Evidence Exists to Support the ALJ's Determination.

#### (1) The ALJ evaluated the medical evidence, and applied the treating physician rule.

The ALJ found that Crowley was severely impaired by anxiety and depression, and impaired by asthma and obesity (Tr. at 28), but that his impairments did not preclude him from performing a variety of unskilled work if he avoided environments with dust, fumes, or respiratory irritants. (*Id.* at 30.) Crowley argues that the ALJ did not give the proper weight to the evidence from Dr. Benezra, one of his treating physicians. (Pl. Mem. at 10-12.) Crowley maintains that the ALJ should have placed more weight on Benezra's testimony because of his long treatment relationship with Dr. Benezra. He argues that his weekly sessions gave Dr. Benezra "an extensive and deep clinical knowledge of [his] condition." (*Id.* at 12.) The ALJ nonetheless found that Dr. Benezra's claims were not well-supported and were inconsistent with

the other evidence as well as with Dr. Benezra's own records. (Tr. at 31-32.) Crowley accuses the ALJ of substituting his own opinion for that of the treating physician by parsing through the record to find only that evidence which supported denying Crowley's claim. (*Id*. at 11.) The ALJ maintains that Dr. Beneza's records were either contradictory, conclusory, or illegible. (Tr. at 31-33.) For example, in his December 8, 2011 evaluation, Dr. Benezra rated Crowley's GAF score at 50, but also described Crowley as functional and normal in the categories that would inform such a score. (Tr. at 31, 208.) While a GAF score of 50 indicates a patient who exhibits suicidal ideation, severe obsessional rituals, or serious impairments in social, occupational, or school functioning, Dr. Benezra noted Crowley was not suicidal, was capable of handling his finances, and had no limitations with understanding, memory, social interaction, or responding appropriately to changes in the work setting. (Tr. at 206-207.) The ALJ found Dr. Benezra's statements that Crowley is disabled and unable to work conclusory, and noted that Dr. Benezra did not provide specific evidence on which his assertions were based. (*Id.* at 31.)

Alternately, Crowley argues that if the ALJ thought the medical evidence provided by Dr. Benezra was insufficient, it was the ALJ's duty to contact Dr. Benezra to request more documentation, and that his failure to do so was an error. (Pl. Mem. at 13.) (*See Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). The record shows that Dr. Benezra had ample opportunity to explain the discrepancies between his observations of Crowley and his conclusions regarding Crowley's impairments, but failed to do so. After a request for information was sent to Dr. Benezra on November 18, 2011 (Tr. at 203), he submitted a questionnaire in which he noted Crowley's "long history of panic disorder," and opined that Crowley's condition would continue indefinitely and would preclude him from working. (Tr. at

26

204-06.) In that same document, Dr. Benezra indicated that Crowley had no limitations in understanding, memory, social interactions, or the ability to respond to changes in the work setting, that his attitude, behavior, speech, thought, and perception were "good," that his mood and affect were "appropriate," and that his insight and judgment were "fair." (*Id.* at 206, 207, 209.) On January 17, 2012, and on April 2, 2012, Dr. Benezra wrote short, handwritten notes indicating that Crowley suffered from panic disorder and depressive disorder, and that these conditions made Crowley unable to work. (Tr. at 368, 380.) Neither letter explained the basis for these conclusions. (*Id.* at 368, 380.) On April 2, 2012, Dr. Benezra filled out a psychiatric and psychological impairment questionnaire about Crowley, in which he again diagnosed Crowley with panic disorder and depression, and noted that Crowley's prognosis was "poor." (*Id.* at 370.) Dr. Benezra indicated that Crowley experienced several of the symptoms of these impairments, but also that Crowley experienced either no limitations or "moderate" limitations on his ability to perform a variety of work-related activities. (*Id.* at 371-72, 373-74, 376.) Dr. Benezra also provided progress notes to the ALJ from Crowley's psychotherapy sessions which took place between August 1, 2011, and July 2, 2012, but the notes are illegible. (Tr. 510-15.) Dr. Benezra thus had the opportunity to explain his conclusion that Crowley is disabled in five separate documents submitted to the ALJ, but failed to do so. Instead, he provided observations of Crowley as functioning normally alongside statements that indicated Crowley's inability to function normally. (*See id.* at 204-10, 368, 370-77, 380, 510-15.)

Finally, Crowley argues that the only medical evidence contrary to Dr. Benezra's conclusion that Crowley is disabled is that of Dr. Kamin. (Pl. Mem. at 15.) Even assuming that Dr. Benezra's assessments led to the conclusion that Crowley is disabled, this argument would be unpersuasive. (*See* Tr. at 204-10, 368, 370-77, 380, 510-15.) At Crowley's hearing, his

27

attorney noted that psychiatric evaluations of Crowley completed by Dr. Benezra and Dr. Fujiwaki indicated that Crowley was an intelligent man, and that he could follow and understand simple instructions, but that he would have some difficulty maintaining a regular schedule because of problems maintaining attention and concentration. (Tr. at 64.) Dr. Fujiwaki concluded that Crowley was able to function normally, and his conclusion was supported by the clinical evidence in his report. (*Id*. at 211-14.)

Accordingly, the ALJ's decision that Crowley is not eligible for disability benefits was determined under the correct legal standard and supported by substantial evidence.

### (2) The ALJ is allowed to rely on the Medical-Vocational Guidelines as a framework for decision-making and need not call a vocational expert.

Crowley argues that, although it is his burden to prove his eligibility for disability benefits, the burden shifts to the Commissioner at the fifth step of the evaluation process to show that, where the plaintiff has shown he is not able to perform past relevant work, "there is other gainful work in the national economy which the plaintiff could perform." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *Campbell v. Sec'y of Health & Human Servs.*, 665 F.2d 48, 51 (2d Cir. 1981), 102 S.Ct. 2956 (1982); *Parker v. Harris*, 626 F.2d at 231; *Carroll* v. *Sec. of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *See* 42 U.S.C. §423(d)(5); 20 C.F.R. §404.1520. Crowley is correct in his statement of burden. He is also correct that the ALJ found that he was unable to perform his past relevant work as a customer service representative. (Tr. at 33.) The ALJ, however, did meet his burden at step five. The ALJ first used the Medical-Vocational Rules as a framework to determine that there are jobs in the economy for which Crowley is fit, based on Crowley's age, education, work experience, and RFC. (*Id*.) The ALJ

then determined that Crowley is able to meet the exertional and mental demands of unskilled work, in an environment free of dust, fumes, or other respiratory irritants. (*Id.* at 33, 34.)

Crowley argues that the ALJ's use of the Medical-Vocational Rules to make his determination was inappropriate, and that the ALJ should have sought the testimony of a vocational expert. (Pl. Mem. at 20.) He asserts that the use of a vocational expert is required where the plaintiff experiences only non-exertional limitations. (*Id.* at 19-20.) Non-exertional impairments, however, do not preclude reliance on the Medical-Vocational Rules for decisionmaking. *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010). Crowley's reliance on *Bapp v. Bowen*, 802 F.2d 601 (2d Cir. 1986), is misplaced. In *Bapp,* the panel held that a vocational expert or other similar evidence is required only in cases where there are non-exertional impairments of such significance as to "diminish the claimant's ability to work—over and above any incapacity caused solely from exertional limitations—so that the claimant is unable to perform the full range of employment indicated by the medical vocational guidelines." *Bapp*, 802 F.2d at 603. The Court in *Bapp* went on to explain that a vocational expert need only be called to testify in cases where the claimant's non-exertional impairment "so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606. Crowley is not so limited. He is able to carry out simple instructions, deal with work changes and respond to supervision. (Tr. at 26-34.) In sum, his impairment does not keep him from performing a range of unskilled work. Crowley's asthma limits him slightly, but there is still a full range of unskilled office work in which Crowley can safely work. (*See* SSR 85-15 (S.S.A.), 1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857.)

### (3) Substantial evidence supports the ALJ's evaluation of the credibility of Crowley's subjective complaints.

The ALJ found that Crowley's statements regarding the intensity, persistence, and limiting effects of his symptoms were not credible to the extent he alleged. (Tr. at 32.) This finding was supported by the record because Crowley's own assertions were not substantiated by the objective evidence and were inconsistent with the other non-medical evidence. 42 U.S.C. § 423(d)(5)(A).

Crowley testified that he had panic attacks three times per week, each of which lasted for six hours, and that his panic attacks and course of treatment were "the same" while he was working and after he was laid off in 2006. (*Id*. at 54-56.) Crowley testified that when he experienced an attack he was unable to continue with his daily activities, yet he was able to work for eight years after the attacks began, and after leaving his job he was able to care for himself, his finances, and his household without assistance. (*Id*. at 50-53, 57-59.) Additionally, medical evidence provided by Dr. Benezra indicated that, although Crowley suffered from anxiety and depression, he was capable of handling his finances, and had no limitations with understanding, memory, social interaction, or responding appropriately to changes in the work setting. (Tr. at 206-207.) Both Dr. Benezra and Dr. Fujiwaki found that Crowley was an intelligent man, and that he could follow and understand simple instructions, but that he would have difficulty maintaining a regular schedule because of problems maintaining attention and concentration, and that he would have some difficulty relating to others due to stress. (*Id*. at 64.)

In assessing Crowley's credibility, the ALJ considered his statements along with medical evidence, and determined that Crowley's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent he alleged. (Tr. at 32). These

findings are supported by substantial evidence, and the Court must uphold the ALJ's decision to discount Crowley's subjective complaints.

### c. New Evidence Does Not Warrant Remand, and, Even If Considered, Would Not Lead to a Different Outcome.

As a part of Crowley's request for a review of the ALJ's decision, he submitted new evidence to the Appeals Council: a psychological evaluation report of him conducted by Dr. Ronald A. Sherman, Ph.D. (Tr. at 522-35), and an additional report from Dr. Benezra completed on October 22, 2012. (*Id*. at 537-38.) This additional evidence, however, does not warrant a remand, because it is not material, in that there is no "reasonable possibility that the new evidence would have influenced the Secretary to decide the claimant's application differently," *Anderson v. Astrue*, 2009 WL 28224584, *13 (E.D.N.Y. 2009); *James v. Comm'r of Soc. Sec.*, 2009 WL 2496485, *10 (E.D.N.Y. 2009), and it does not show that the ALJ's decision was against the weight of the evidence. 20 C.F.R. § 404.970; *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) (the Appeals Council may remand a case back to an ALJ when evidence it receives shows that the ALJ's decision is against the weight of the evidence).

Dr. Sherman examined Crowley on September 15, 2012, several weeks after the ALJ's decision, and outside the close of the relevant time period. (Tr. at 522-24.) Crowley argues that, although the examination occurred after the relevant time period, Dr. Sherman rendered a retrospective opinion which referred to the relevant time period. (Pl. Mem. at 18.) Dr. Sherman noted Crowley's history with anxiety and depression, as well as Crowley's course of treatment with Dr. Benezra. (Tr. at 523.) Even if these statements are considered, they do not change the outcome because they do not show that the ALJ's decision was against the weight of the evidence. Dr. Sherman's evaluation, and the letter submitted by Dr. Benezra, simply restate information Dr. Benezra had previously submitted.

## IV. CONCLUSION

For the reasons set forth above, I recommend that Defendant's motion be **GRANTED**, and that the Complaint be **DISMISSED**.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served a copy of the recommended disposition to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Alison J. Nathan, 40 Foley Square, Room 2102, and to the chambers of the undersigned, 500 Pearl Street, Room 1970.  Failure to file timely objections shall constitute a waiver of those objections in both the District Court on later appeal to the United States Court of Appeals.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West. Supp. 1995); Fed.R.Civ.P. 72, 6(a), 6(d).

**Dated: March 24, 2014**
**New York, New York**

Respectfully Submitted,

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**